**Sammy Kay PORTER, Respondent,**

v.

**TOYS 'R' US–DELAWARE, INC., Appellant.**

**No. WD 61645.**

Missouri Court of Appeals, Western District.

Sept. 28, 2004.

As Modified Nov. 23, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 23, 2004.

Application for Transfer Denied Jan. 25, 2005.

John F. Murphy and Bryan T. Pratt, Kansas City, MO, for Appellant.

Jack T. Bangert, Mark D. Katz, and Lloyd L. Messick, Kansas City, MO, for Respondent.

Jason P. Osteen, Kansas City, MO, for Amicus Curiae.

Before ULRICH, P.J., and HOWARD and NEWTON, JJ.

PER CURIAM.

Toys "R" Us (TRU) appeals the judgment of the trial court following a jury trial in favor of Sammy Porter awarding her $300,000 in damages on her premises liability action. TRU raises six points on appeal. It claims that the trial court erred in: (1) failing to grant its motions for directed verdict and judgment notwithstanding the verdict (JNOV); (2) admitting into evidence TRU's interrogatory answer identifying an expert witness; (3) excluding evidence that Ms. Porter's medical bills were satisfied by less than the amount charged; (4) admitting into evidence all charged medical expenses; (5) denying TRU's motion for remittitur; and (6) allowing certain comments by Ms. Porter during closing argument.

For the reasons set forth below, we affirm the trial court's judgment.

## Facts

Sammy Porter was a customer in the Toys "R" Us store in Columbia, Missouri, on August 2, 1997. As she walked through the stroller aisle, a stroller fell off the display shelf on top of her striking her in the head, shoulder, arm, and thumb. The stroller fell off the shelf when it was dislodged as an employee adjusted a baby car seat on the shelf behind the stroller. Ms. Porter did not seek medical attention at the time although she felt light-headed, experienced pressure on her shoulder, and had bruises on her arm and thumb. As the day progressed, Ms. Porter's head and shoulder became more tender and bruised, and her neck became stiffer. She had trouble sleeping that night, and her arm ached.

Ms. Porter continued to experience pain in her neck and shoulder and weakness in her arm over the next two weeks. On August 17, as she was shaking a can of paint, she felt a pop, and excruciating pain radiated from her neck down into her shoulders and arms. The next day, Ms. Porter saw a chiropractor for her pain. The chiropractor treated Ms. Porter for the next two months with manipulation, massage, and exercise.

Ms. Porter's pain, stiffness, and soreness waxed and waned for the next several months until August 1998, when she entered the emergency room with severe, debilitating pain in her neck. She then saw an orthopedic surgeon specializing in the maladies of the spine and neck and was diagnosed with an extruded disk. After an unsuccessful attempt at conservative treatment including exercise and steroid injections, Ms. Porter underwent surgery on November 17, 1998.

Ms. Porter filed her petition for damages against TRU on May 25, 2000. In her petition, Ms. Porter alleged negligence of the TRU employee who dislodged the stroller and improper stacking of merchandise. The jury returned a verdict in Ms. Porter's favor on the stacking count and awarded her $300,000 in damages. The trial court entered judgment accordingly. TRU filed post trial motions, which were denied. This appeal follows.

## Point I

In its first point on appeal, TRU claims that the trial court erred in not granting its motion for directed verdict and motion for JNOV. It argues that Ms. Porter failed to make a submissible case. Specifically, TRU claims that Ms. Porter failed to present substantial evidence that it knew or by using ordinary care could have known that the stroller aisle was not reasonably safe. A defendant is entitled to a judgment notwithstanding the verdict only when the plaintiff fails to make a submissible case. *Altenhofen v. Fabricor, Inc.*, 81 S.W.3d 578, 584 (Mo.App. W.D. 2002); *Poloski v. Wal–Mart Stores, Inc.*, 68 S.W.3d 445, 448 (Mo.App. W.D.2001). To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability. *Id.* " 'Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case.' " *Id.* (quoting *Love v. Hardee's Food Sys., Inc.*, 16 S.W.3d 739, 742 (Mo.App. E.D.2000)).

In reviewing for a submissible case, the evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the plaintiff. *Id.*; *Moore ex rel. Moore v. Bi–State Dev. Agency*, 87 S.W.3d 279, 286 (Mo.App. E.D. 2002). The plaintiff's evidence is presumed to be true. *Id.* Any of the defen-

dant's evidence that does not support the plaintiff's case is disregarded. *Id.; Poloski*, 68 S.W.3d at 448. An appellate court will not, however, supply missing evidence or give the plaintiff the benefit of unreasonable, speculative or forced inferences. *Id.; Moore*, 87 S.W.3d at 286. Whether the evidence in a case is substantial and whether the inferences drawn therefrom are reasonable are questions of law. *Poloski*, 68 S.W.3d at 448. Granting a JNOV is a drastic action that should be done only when reasonable persons could not differ on a correct disposition of the case. *Moore*, 87 S.W.3d at 286. An appellate court will not overturn a jury's verdict unless there is a complete absence of probative facts to support it. *Id.; Poloski*, 68 S.W.3d at 449.

"The general duty owed to an invitee by the owner of the premises is the exercise of reasonable and ordinary care in making the premises safe." *Morrison v. St. Luke's Health Corp.*, 929 S.W.2d 898, 903 (Mo.App. E.D.1996); *Luthy v. Denny's, Inc.*, 782 S.W.2d 661, 662 (Mo.App. W.D.1989). To make a submissible case as an injured invitee, a plaintiff must show that the defendant knew or, by using ordinary care, should have reasonably known of the dangerous condition and failed to use ordinary care to remove it, barricade it, or warn of it, and that plaintiff sustained damage as a direct result of such failure. *Emery v. Wal–Mart Stores, Inc.*, 976 S.W.2d 439, 443–44 (Mo. banc 1998); MAI 22.03 [1995 Revision]. In this point, TRU contends only that Ms. Porter failed to present substantial evidence that TRU knew or by using ordinary care should have reasonably known that the stroller aisle was not reasonably safe. The other elements required for submissibility are, therefore, not addressed on this appeal. *Luthy*, 782 S.W.2d at 663.

A storeowner is not liable to a business invitee for injury resulting from a dangerous or unsafe condition on the premises unless the storeowner had actual or constructive knowledge of the condition in time to have remedied the condition prior to the injury. *Elmore v. Wal–Mart Stores, Inc.*, 812 S.W.2d 178, 179–80 (Mo. App. E.D.1991). A store owner's actual knowledge of a dangerous condition is shown if an agent or employee of the owner knew of the dangerous condition. *Bynote v. Nat'l Super Mkts., Inc.*, 891 S.W.2d 117, 120 (Mo. banc 1995). To establish constructive knowledge or notice, the condition must have existed for a sufficient length of time or the facts must be such that the defendant should have reasonably known of its presence. *Love*, 16 S.W.3d at 742. " '[T]he method of merchandising and the nature of the article causing injury' " are important factors to be considered in determining whether a defendant had constructive notice of a dangerous condition. *Emery*, 976 S.W.2d at 444 (quoting *Sheil v. T.G. & Y. Stores Co.*, 781 S.W.2d 778, 780 (Mo. banc 1989)).

TRU contends that Ms. Porter failed to present substantial evidence that it knew or by using ordinary care should have reasonably known that the stroller aisle was a dangerous or unsafe condition. Instead, it argues, the record demonstrates the opposite—that its stroller aisle was reasonably safe. In making this argument, TRU relies on the testimony of several TRU employees. These employees testified that they were not aware of any other incidents where a stroller fell or became dislodged. They also testified that the Columbia TRU store was safety conscious, that the strollers were stored on a flat surface with metal fencing across the front of the shelf, and that the stroller brakes were usually applied. This evidence, however, does not support TRU's argument that Ms. Porter failed to make a

submissible case. Under the appropriate standard of review, even if this evidence favors TRU's position, it must be disregarded. *Moore*, 87 S.W.3d at 286; *Poloski*, 68 S.W.3d at 448. Instead, the evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to Ms. Porter. *Id.*

The evidence in this case showed that a heavy stroller fell off a shelf and struck Ms. Porter. The evidence further showed that TRU uses a self-service form of merchandising, and merchandise sometimes falls off the shelves at the store. The strollers are displayed side-by-side on a shelf that is four and a half feet above the ground. The tops of the strollers reach higher than six feet above the ground. The strollers sit on wheels. To make the strollers easily accessible to customers, they are not secured to the shelf. Recognizing the danger in displaying heavy strollers on a high shelf, a manager at the Columbia TRU store testified that certain precautions are made on the stroller aisle to prevent the strollers from falling off the shelf. For example, a metal fencing runs across the front of the stroller shelf; the tops of the stroller wheels are, however, higher than the fencing. Also, the strollers' brakes are sometimes applied. Based on this self-service method of merchandising and the nature of the article causing injury—a heavy stroller displayed four and a half feet above the floor falling from the display shelf—plaintiff has shown that TRU had constructive notice that the stroller aisle was a dangerous or unsafe condition. *See e.g. Emery*, 976 S.W.2d at 444; *Sheil*, 781 S.W.2d at 781–82 (finding that in a self-service store, it is likely that items for sale will fall to the floor, and an owner of a self-service store will be deemed to have knowledge of this problem). Ms. Porter, therefore, made a submissible case. The trial court did not err in denying TRU's motion for directed verdict and motion for JNOV.

Point I is denied.

## Point II

In point two, TRU claims that the trial court erred in admitting into evidence TRU's interrogatory answer identifying Dr. Lowry Jones as an expert witness. At trial, the following interrogatory and answer were read into evidence:

> Interrogatory No. 17: State the name and address of each and every person who you expect to call as an expert witness at the trial of this case, and for each such expert state the general nature of the subject matter to which they are expected to testify.

> Answer: TRU states Lowry Jones, Jr., M.D., Dickson–Diveley Midwest Orthopedic Clinic, Inc., 4320 Wornall Road, Suite 160, Kansas City, Missouri, will generally testify regarding plaintiff's medical condition and causation.

TRU contends that the answer was not relevant or probative to any issue at trial and that its introduction into evidence created a negative inference with the jury that Dr. Jones' medical opinions must have favored Ms. Porter when he did not testify for TRU.

The admission or exclusion of evidence lies within the sound discretion of the trial court and will not be disturbed absent abuse of discretion. *Nelson v. Waxman*, 9 S.W.3d 601, 603 (Mo. banc 2000). " 'The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration.' " *Id.* at 604 (quoting *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991)).

The principal criterion for the admission of evidence is relevancy. *Guess v. Escobar*, 26 S.W.3d 235, 242 (Mo.App. W.D.2000). Evidence is logically relevant if it tends to prove or disprove a fact in issue or corroborate other evidence. *Id.* Logically relevant evidence is not necessarily admissible; the evidence must also be legally relevant. *Id.* " 'Legal relevance involves a process through which the probative value of the evidence (its usefulness) is weighed against the dangers of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or needless presentation of cumulative evidence (the cost of evidence).' " *Id.* (quoting *Olinger v. Gen. Heating & Cooling Co.*, 896 S.W.2d 43, 48 (Mo.App. W.D.1994)).

The failure of a party to call a witness who has knowledge of facts and circumstances vital to the case generally raises a presumption or inference that the testimony would be unfavorable to the party failing to offer it. *Leehy v. Supreme Express & Transfer Co.*, 646 S.W.2d 786, 790 (Mo. banc 1983); *Williams v. Cas. Reciprocal Exch.*, 929 S.W.2d 802, 805 (Mo.App. W.D.1996). If the witness is equally available to both parties, it is improper for a party to argue such an adverse inference. *Leehy*, 646 S.W.2d at 790; *Williams*, 929 S.W.2d at 806.

TRU relies on *Hulsey v. Schulze*, 713 S.W.2d 873 (Mo.App. E.D.1986), in arguing that the naming of an expert witness in an interrogatory answer is irrelevant and inadmissible at trial. In *Hulsey*, the plaintiff appealed the trial court's ruling prohibiting her from reading the defendants' answer to an interrogatory identifying an expert witness on the ground that the answer was irrelevant. *Id.* at 876. In finding that the trial court did not abuse its discretion in excluding the evidence, the Eastern District explained that the defendants were not required by law to produce at trial a witness named in their answer. *Id.* Furthermore, the record reflected no evidence that the person named was qualified to testify as an expert. *Id.*

*Hulsey* is distinguishable from the instant case. In this case, the interrogatory answer identifying the expert witness was relevant. Dr. Jones was not withdrawn as a witness by TRU prior to trial. Counsel for TRU indicated prior to trial that he had not decided whether he would call Dr. Jones to testify. Relying on this representation, Ms. Porter's attorney asked about Dr. Jones during voir dire. Specifically, he asked potential jury members if Dr. Jones or his partners had ever treated them or their immediate family. Two venirepersons indicated that they had been treated by Dr. Jones or a member of his practice group, and Ms. Porter's attorney further inquired about the nature of the treatment. TRU did not object to any of this questioning.

Ms. Porter's attorney, again relying on TRU's implied representation that it might call Dr. Jones as an expert witness in its behalf, referred to Dr. Jones during his opening statement. He explained to the jury that TRU had Dr. Jones examine Ms. Porter's medical records and that he assumed TRU would call Dr. Jones to testify. TRU did not object to these statements. Only when Ms. Porter's attorney sought to read TRU's interrogatory answer into evidence during trial did TRU object and withdraw Dr. Jones as an expert.

TRU's identification of Dr. Jones in its interrogatory and its attorney's representation prior to trial that he had not yet decided whether to call Dr. Jones to testify were valid reasons for Ms. Porter's attorney's inquiry about Dr. Jones during voir dire and reference to him in his opening statement. Believing Dr. Jones would be testifying for TRU at trial, Ms. Porter's

attorney was compelled to ask potential jurors about him or face waiving any right to challenge a juror who knew the doctor. *See Wingate by Carlisle v. Lester E. Cox Med. Ctr.,* 853 S.W.2d 912, 914 (Mo. banc 1993) (holding that failure to ask a question on voir dire waives the right to challenge the juror on any grounds not asked). Unlike in *Hulsey,* the interrogatory answer identifying Dr. Jones as an expert witness in this case was relevant to explain to the jury Ms. Porter's attorney's references to Dr. Jones during voir dire and his opening statement. Nothing in the *Hulsey* case indicated that the witness was mentioned during trial.

Furthermore, Ms. Porter's attorney did not argue to the jury an adverse inference from TRU's failure to call Dr. Jones to testify. When Ms. Porter sought to introduce the interrogatory answer into evidence, her attorney specifically told the trial court that he would not comment on TRU's failure to call Dr. Jones. Ms. Porter's attorney did not introduce the interrogatory answer to argue an adverse inference from TRU's failure to call the doctor to testify. Instead, relying on the implied representation of TRU that it might call Dr. Jones as an expert witness, Ms. Porter's attorney presented the evidence to clarify the doctor's role at trial. This evidence became relevant after Ms. Porter's attorney referred to him during voir dire and in his opening statement without objection. The trial court, therefore, did not abuse its discretion in admitting the interrogatory answer.

Point II is denied.

## Points III and IV

■ In its third point on appeal, TRU claims that the trial court erred in excluding evidence that Ms. Porter's medical bills were satisfied by less than the amount charged. Specifically, it contends that the

trial court abused its discretion by prohibiting it from asking Mrs. Porter two questions:

> (1) "Isn't it true that it took much less than $33,000 to pay and satisfy all of your medical bills?" and,
>
> (2) "Isn't it true that a separate entity not involved in this lawsuit has determined that the reasonable value of [your] medical bills was much less than $33,000?"

TRU argues it should have been able to ask these questions to show that Ms. Porter's medical expenses were satisfied by substantially less than the $33,000 bill submitted by her, which was directly probative to the reasonableness of her medical bills.

In a related issue raised in point four, TRU argues that the trial court erred in admitting into evidence the full amount Mrs. Porter was charged for medical care. It contends that the trial court allowed Ms. Porter to improperly submit medical expenses that were billed but were satisfied for much less than the billed amount.

Mrs. Porter objected at trial to TRU's two questions set forth above because she believed they implicated the collateral source rule. Additionally, she points out on appeal that TRU could have, and was not prevented from, challenging the reasonableness of her medical expenses through other means.

■ " 'The collateral source rule is an exception to the general rule that damages in tort should be compensatory only.' " *Washington v. Barnes Hosp.,* 897 S.W.2d 611, 619 (Mo. banc 1995) (quoting *Overton v. United States,* 619 F.2d 1299, 1306 (8th Cir.1980)). It prevents a tortfeasor from reducing its liability to an injured person by proving that payments were made to the person from a collateral source. *Duckett v. Troester,* 996 S.W.2d

641, 648 (Mo.App. W.D.1999). The Missouri Supreme Court has defined the collateral source rule as providing that

> "a wrongdoer is not entitled to have the damages to which he is liable reduced by proving that plaintiff has received or will receive compensation or indemnity for the loss from a collateral source, wholly independent of him, or, stated more succinctly, the wrongdoer may not be benefited by collateral payments made to the person he has wronged."

*Washington,* 897 S.W.2d at 619 (quoting *Collier v. Roth,* 434 S.W.2d 502, 506–07 (Mo.1968)).

 Medical insurance purchased by a plaintiff and governmental benefits contingent upon a plaintiff's financial need or special status, such a Medicare and Medicaid, are independent sources that are subject to the collateral source rule, and, thus, a defendant may not inform the jury of such sources. *Id.* at 619–20. The rationale for such application of the collateral source rule is that "plaintiffs who contract for insurance or other benefits with funds they could have used for other purposes are entitled to the benefit of their bargain." *Id.* at 619 (citing *Kickham v. Carter,* 335 S.W.2d 83, 90 (Mo.1960), and *Overton,* 619 F.2d at 1306). Also, we have previously held that medical charges reduced, discounted, or "written-off" as full payment for services pursuant to a contract or agreement between the medical provider and the insurance company or as part of Medicare coverage may be subject to the collateral source rule in Missouri. *Brown v. Van Noy,* 879 S.W.2d 667, 676 (Mo.App. W.D.1994). We reasoned that discounted medical expenses are not mate-

rially different than expenses paid by insurance or another source. *Id.*

But, application of the collateral source rule is not simple; the rule constitutes a combination of rationales applied in a number of different circumstances to determine whether evidence of mitigation of damages should be precluded from admission as evidence. *Washington,* 897 S.W.2d at 619. For example, Missouri's courts are not uniform on whether the rule applies where gratuitous services were rendered to a plaintiff as a result of that person's special status. *Id.* at 620.

While the present case was pending on appeal, our supreme court handed down *Farmer–Cummings v. Personnel Pool of Platte County,* 110 S.W.3d 818 (Mo. banc 2003). In that case, the Labor and Industrial Relations Commission awarded Ms. Farmer–Cummings medical expenses incurred because of her asthmatic condition, which resulted from her work environment. *Id.* at 820. The Commission did not allow Ms. Farmer–Cummings to recover fees healthcare providers adjusted or "wrote-off" from the original bills. *Id.*

On appeal, Ms. Farmer–Cummings contested the Commission's disallowance of the amounts adjusted or written-off by her medical providers. She claimed that section 287.270, RSMo 2000, which provides that in workers' compensation cases an employer's liability is not reduced by the amount of contributions to the employee from another source, mandates that such reductions of her medical expenses should not be considered. *Id.* at 822.[1]

In addressing Ms. Farmer–Cummings' claim on appeal, the Missouri Supreme Court observed that "there [was] no real issue as to whether the initial fees were

---

1. Section 287.270 provides in pertinent part, "No savings or insurance of the injured employee, nor any benefits derived from any other source than the employer or the em-

ployer's insurer for liability under this chapter, shall be considered in determining the compensation due hereunder."

'fair and reasonable' as those terms are commonly understood." *Id.* at 821. Rather, "the real issue [was] whether the original medical bills remain 'fees and charges'. collectable by the employee [under section 287.140, which governs the employer's duty to provide medical and other services to an injured employee,] if [the bills] are subsequently reduced or written-off by the provider in the collection process." *Id.* In deciding the issue, the Court noted that section 287.270 "clearly was intended to allow the employee to benefit from any collateral source the employee might have available to him or her, independent of the employer, whether purchased or not." *Id.* at 822. But, the Court found that "[a]lthough the write-offs and fee adjustments constitute a 'reduction in cost,' this reduction was not effected by any act of Ms. Farmer–Cummings. [She] incurred no expense or effort, nor did she 'economize' by foregoing any privilege." *Id.* Furthermore, the Court remarked that write-offs and fee adjustments "are often the product of a healthcare provider's decision to balance the provider's books in accordance with actual amounts received or a decision that the outstanding amount is not worth pursuing." *Id.* Therefore, the Court concluded that "[s]uch write-offs and fee adjustments are neither 'savings . . . of the injured employee' nor 'benefits derived from any other source than the employer or the employer's insurer for liability' " under section 287.270. *Id.* The Court held that "if [the employer] establishes by a preponderance of the evidence that the healthcare providers allowed write-offs and reductions for their own purposes and [the employee] is not legally subject to further liability, [the employee] is not entitled to any windfall recovery." *Id.* at 823. The Court also explained, "[i]t is a defense

[of the employer] to establish that [the employee] was not required to pay the billed amounts, that her liability for the disputed amounts was extinguished, and that the reason that her liability was extinguished does not otherwise fall within the provisions of section 287.270." *Id.*

In arriving at this conclusion, the Court cited two workers' compensation cases in which the reviewing court determined that an employee was not entitled to compensation for healthcare provider write-offs: (1) *Mann v. Varney Construction,* 23 S.W.3d 231, 233 (Mo.App. E.D.2000), wherein "[t]he court ruled that an employee is not entitled to compensation for Medicaid write-off amounts when the total amount submitted to Medicaid will never be sought from claimant"; and, (2) *Lenzini v. Columbia Foods,* 829 S.W.2d 482, 487 (Mo. App. W.D.1992),[2] wherein the court reduced a workers' compensation award by amount already written-off by health care providers. *Id.* at 821. The Court noted that in both of these cases, an employee's actual liability for the expenses was required. *Id.* Nonetheless, the burden of proof clearly rests with the employer.

The decision in *Farmer–Cummings* rests solely on the basis of the Court's construction of two workers' compensation statutes. However, TRU urges us to decide that the *Farmer–Cummings* case has application beyond a workers' compensation setting so as to provide TRU relief in this case.

Even if we were inclined to engraft our supreme court's interpretation of these workers' compensation statutes onto civil litigation cases, the posture of this particular case does not allow us to isolate and decide the pinpoint issue framed by the

---

**2.** Overruled in part on other grounds by *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220 (Mo. banc 2003).

Court in *Farmer–Cummings*. This is because our resolution of the issues raised by TRU in points three and four is handicapped due to the fact that Ms. Porter's medical exhibits and bills complained of are not a part of the record on appeal. Nor was there an offer of proof made to the trial court regarding the disputed medical charges. Accordingly, we have no way of knowing from the record if the kind of bad debt write-offs and fee adjustments contemplated by *Farmer–Cummings* existed in this case and were specifically pointed out to the trial court. Of course, TRU and its able counsel did not have the benefit of Farmer–Cummings and its reasoning during the trial of this case.

▊ In order to demonstrate the prejudice alleged by TRU, it needed to establish both at the trial and appellate levels what in fact happened with Ms. Porter's bills. Ms. Porter's counsel has submitted some health care statements attached to a supplemental brief. But, these statements were not trial exhibits, and it is still unclear on appeal what the trial judge and jury saw. " 'Documents, depositions, etc., which are only attached to a party's brief and not contained in the legal file, are not part of the record and will not be considered on appeal.' " *Choate v. Natvig*, 952 S.W.2d 730, 733 (Mo.App. S.D.1997) (quoting *Strycharz v. Barlow*, 904 S.W.2d 419, 426 (Mo.App. E.D.1995)). Moreover, the reasons for any reductions in the bills were never fully explained.[3]

During a bench conference, TRU requested permission to ask of Ms. Porter the two questions set forth above regarding her medical bills. After the trial court denied the request, TRU failed to make an offer of proof or outline what the expected testimony would have been and how it would have been favorable to its position.

Our courts have long held that "[n]othing is preserved for appellate review when a court rejects evidence, in the absence of an offer of proof." *Tile–Craft Prods. Co. v. Colonial Properties, Inc.*, 498 S.W.2d 547, 549 (Mo.1973). In *Wilkerson v. Prelutsky*, 943 S.W.2d 643, 646–47 (Mo. banc 1997), the Missouri Supreme Court discussed the reasons underlying the rule requiring an offer of proof; quoting John W. Strong et al., *McCormick on Evidence* § 51 (4th ed.1992), the Court explained:

"While a secondary reason for an offer of proof is that it permits the judge to consider further the claim of admissibility, the primary reason is to include the proposed answer and expected proof in the official record of the trial, so that in case of appeal upon the judge's ruling, the appellate court may understand the scope and effect of the question and proposed answer in considering whether the judge's ruling sustaining an objection was proper."

▊ When Mrs. Porter's medical bills were offered, TRU objected by referring the court to its previously denied motion in limine, in which it had sought to exclude evidence of medical expenses that were written-off. When the trial court again overruled TRU's objection, TRU did not seek to make an offer of proof. TRU never offered any documentation or explanation of any alleged write-offs.

Even if we were to assume that Ms. Porter's medical changes exceeded the amount paid to satisfy them, without the ability to review the medical expenses we don't know the specific reason for the reductions. Generally an offer of proof allows the Appellate Court to consider a claim of admissibility. In this case an offer of proof would have provided this court with the ability to evaluate TRU's

3. Ms. Porter's medical bills totaled $33,702.95.

argument for the inadmissibility of evidence.

We are left to speculate about the nature of Ms. Porter's medical expenses that TRU wanted excluded. Because we cannot discern a full understanding of TRU's claims of error from the record on appeal, we are prevented from resolving those claims " 'with some degree of confidence that our decision is reasonable, fair and accurate.' " *Choate*, 952 S.W.2d at 733 (quoting *C-4 Corp. v. E.G. Smith Constr. Prods.*, 894 S.W.2d 242, 244 (Mo.App. E.D. 1995)).[4]

Accordingly, Points III and IV are denied.

### Point V

■ In its fifth point on appeal, TRU claims that the trial court erred in denying its motion for remittitur. It contends that the jury's verdict of $300,000 exceeded Ms. Porter's own valuation of the fair and reasonable compensation for her damages. Specifically, TRU claims that the award exceeded Ms. Porter's sworn interrogatory response that stated her damages as her medical bills plus an additional $200,000 for a total of just over $233,000.

■ The record shows that Ms. Porter sought, and was granted, leave to amend her prayer for damages to her medical bills plus $290,000 for a total of just over $323,000. Rule 55.33(a) provides that leave to amend pleadings "shall be freely given when justice so requires." A trial court has broad discretion to allow the amendment of a pleading to alter the prayer for damages even after trial has commenced. *Geiser v. Burlington N. R.R. Co.*, 722 S.W.2d 122, 125 (Mo.App. E.D.

1986). The trial court's ruling will not be overturned absent a clear abuse of discretion. *Id.*

Ms. Porter moved to amend her prayer for damages based on her medical condition and her life expectancy of 29.5 years. The amendment did not inject new causes of action or require TRU to explore additional defenses. TRU did not seek a continuance in response to the motion to amend. In fact, the trial court invited TRU to reopen the evidence, but it declined. Under these circumstances, the trial court did not abuse its discretion in allowing Ms. Porter leave to amend her pleadings. *See, e.g., Id.* The jury's verdict of $300,000 was within Ms. Porter's prayer for damages. The trial court did not err in denying TRU's motion for remittitur.

Point V is denied.

### Point VI

■ In its sixth and final point on appeal, TRU claims that the trial court plainly erred in allowing certain comments by Ms. Porter during closing argument. TRU did not object to the comments at trial. Accordingly, it requests plain error review under Rule 84.13(c). "Rarely will comments made during closing argument rise to the level of plain error entitling a party to relief." *Morgan Publ'ns, Inc. v. Squire Publishers, Inc.*, 26 S.W.3d 164, 170 (Mo.App. W.D.2000). Plain error occurs only if the " 'closing argument contains reckless assertions, unwarranted by proof and intended to arouse prejudice, which, therefore, may be found to have caused a miscarriage of justice.' " *Id.* (quoting *Hensic v. Afshari Enters., Inc.*, 599 S.W.2d 522, 526 (Mo.App. E.D.1980)).

---

4. We again note that *Farmer–Cummings* was handed down while this case was on appeal. We allowed the parties supplemental arguments to address its effect, but neither party had the benefit of the rationale of *Farmer–Cummings* when dealing with the medical bill issues during trial.

TRU first complains about the following comments:

They don't care. They don't know back in New Jersey at corporate headquarters. They are sitting back there in a walnut paneled boardroom, and this is nothing ... You saw these fancy blow-ups they had. Every one of those blow-ups is the cost of a new suit. Wouldn't it be nice to spend that money walking down the aisle in the Toys "R" Us store and just figuring out what happened? ... I don't know why their corporate man back in New Jersey answered that way under oath. They knew Mr. McGannon did this. That's just indicative of the way they handled this whole case.

TRU argues that these comments were made solely to inject prejudice against it as a corporate defendant. It also asserts that the comments were made to call attention to the large difference in financial positions of the parties and to pit Ms. Porter against the "aristocratic" corporate defendant.

██ Indeed, references to the size, wealth, and corporate status of a party are improper when intended to arouse prejudice and are not within the scope of legitimate argument. *Gilbert v. K.T.I., Inc.,* 765 S.W.2d 289, 300 (Mo.App. W.D.1988). However, the above comments were legitimate comments about the evidence. At trial, Ms. Porter introduced evidence that TRU failed to investigate the incident and was indifferent to it. For example, Ms. Porter elicited testimony from the store manager that he did not remember talking to the employee who dislodged the stroller after the incident. Ms. Porter also introduced TRU's interrogatory answers that it could not identify either the employee who dislodged the baby stroller or the stroller that struck Ms. Porter. In light of the evidence, the comments by Ms. Porter's attorney were reasonable. Even if some of the comments touched on the wealth of TRU, the comments did not cause a miscarriage of justice.

TRU next complains about the following comments:

This is her day for justice. We do not want sympathy.... But she wants you to know and made sure that I asked that she is not wanting you to give her a thing. She wants justice.

TRU asserts that these comments were prejudicial because Ms. Porter never pleaded punitive damages. Along with these comments, Ms. Porter's counsel added, "She wants you to do what you think is fair and just and right." This argument does not indicate that Ms. Porter was seeking more than fair compensation. The comments were not improper.

Finally, TRU refers to two other comments by Ms. Porter's counsel. It fails, however, to explain why the statements were improper or prejudicial.

The trial court did not plainly err in allowing these comments during closing, so Point VI is denied.

## Conclusion

For the foregoing reasons, we affirm the trial court's judgment.