Hunter LAMPE and Summer Lampe,
Plaintiffs–Respondents,

v.

Bette J. TAYLOR and The City
of Springfield, Missouri,
Defendants–Appellants.

No. SD 29897.

Missouri Court of Appeals,
Southern District,
Division One.

March 31, 2011.

Paul Forrester Sherman, Springfield, MO, for Appellant City of Springfield.

Bette J. Taylor, pro se.

Eric G. Jensen, Springfield, MO, for Respondent Summer Lampe.

JEFFREY W. BATES, Presiding Judge.

The City of Springfield (City) appeals from a judgment entered after a jury trial holding the City and Bette Taylor (Taylor) jointly and severally liable for injuries sustained by Summer Lampe (Lampe) in a traffic accident.[1] On appeal, the City contends the trial court erred by denying the City's motion for judgment notwithstanding the verdict and by excluding evidence relevant to damages. We affirm.

### Factual and Procedural Background

In November 2003, Lampe filed a lawsuit against Taylor and the City after she was injured in an automobile collision that occurred at the intersection of Portland Street and Grant Avenue in Springfield, Missouri. The petition alleged that Taylor was negligent, *inter alia*, because she failed to obey the traffic signal on Portland. The petition alleged that the City was negligent because: (1) the placement of the traffic signal at the intersection did not follow the visibility requirements of the Manual on Uniform Traffic Control Devices (Manual); and (2) the City failed to clear vegetation away from a "signal ahead" sign on Portland. A jury returned a verdict in favor of Lampe and awarded

her damages in the amount of $399,322.71. The trial court entered a judgment holding the City and Taylor jointly and severally liable for Lampe's damages.

On appeal, the evidence and all reasonable inferences derived therefrom must be viewed in the light most favorable to the jury's verdict; all contrary evidence and inferences are disregarded. *Stancombe v. Davern,* 298 S.W.3d 1, 2 (Mo.App. 2009). Viewed from that perspective, the following evidence was presented at trial.

Grant has one northbound and two southbound lanes. Portland is a two-way street. The speed limit on each street is 30 miles per hour. The westbound approach to the intersection on Portland has two traffic lights. One light is mounted on the outside (i.e., south side) of a pole on the southwest corner of the intersection. The other light is mounted on the outside (i.e., north side) of a pole on the northwest corner of the intersection. The traffic lights for drivers traveling on Grant were installed on the southeast and northeast corners of the intersection, which placed these lights almost directly in front of the traffic lights used by drivers heading west on Portland.

On the morning of October 6, 2001, Taylor was driving a Mercury Sable westbound on Portland. Hunter Lampe (Hunter), Lampe's husband, was driving a Chevrolet Cavalier in the inside, southbound lane of Grant. Lampe was sitting in the passenger seat. The weather conditions were clear and dry. The Cavalier entered the intersection on a green light. Taylor ran the red light and hit the Cavalier in a T-bone collision. The Cavalier was hit in the driver's side door. Hunter described the collision this way:

---

1. Lampe's husband, Hunter Lampe, had asserted a loss of consortium claim that was dismissed with prejudice prior to voir dire.

[A]s we were passing through the intersection with the green light I felt like a flick of light. Just enough time for my window to bust in my face. Not really ever seeing the car, just—I knew it was yellow and I knew it busted my window. And when she hit us the impact was so hard that it sent us completely across the outside lane and pushed us into the telephone pole.

Prior to the collision, Hunter did not see a vehicle stopped on Portland at the red light. Lampe suffered a lumbar burst fracture of the L–1 vertebra of her back.

Corporal Chad Hampton (Cpl.Hampton) of the Springfield Police Department investigated the collision. Taylor told Cpl. Hampton that "she was westbound on Portland, did not see the signal at Grant was red, and struck [the Lampe vehicle]." Cpl. Hampton observed no braking-related skidmarks or other tire marks left on the road by the Sable. He took pictures of the scene and vehicles immediately after the collision. The photographs of the Sable show this vehicle sustained heavy damage to its front end. The hood was crumpled up so high that it blocked Taylor's view of the road. The force of the impact spun the Sable around so that it was facing eastbound on Portland. The photographs of the Cavalier show it sustained massive damage to its left side. The driver's door had a deep concave depression that intruded into the driver's compartment. The impact knocked the Cavalier from its position in the inner, southbound lane of Grant, caused the vehicle to strike a utility pole on the southwest corner of the intersection and left the car facing eastbound on Portland.

John Lampe (John) was Lampe's father-in-law. The day after the collision occurred, John went to the scene of the collision and took a number of photographs. Based upon his observations of the scene, he was able to authenticate Exhibit 90. This exhibit, which was a videotape made that same day depicting the appearance of the intersection, was admitted in evidence and played for the jury. Ex. 90 showed dense overhanging foliage at various intervals on the north side of Portland because the trees still had all of their leaves. Approximately 270 feet from the intersection, there was a pole containing a "signal ahead" sign that depicted the image of the traffic light. This sign had been placed in a homeowner's yard adjacent to the north Portland sidewalk. Ex. 90 showed that overhanging foliage from a tree on the north side of Portland obscured the "signal ahead" sign until a driver was almost even with the tree. Ex. 90 also showed that there was a yellow school crossing sign approximately 40 feet west of the "signal ahead" sign. This sign had been mounted on a light pole adjacent to the sidewalk and was closer to Portland than the "signal ahead" sign. John testified that a driver headed west on Portland and approaching Grant would not be able to see both Portland traffic lights. On the north side of the intersection, the red signal facing Portland (which was the highest of the three lights on the device) was obstructed by the overhanging foliage when a driver was in the area of the "signal ahead" and school crossing signs. In addition, the Portland traffic light was blocked by the closer Grant traffic light, which was almost directly in line with the rearward Portland traffic light. On the south side of the intersection, the Portland traffic light was blocked by a telephone pole and the closer Grant traffic light, which was almost directly in line with the rearward Portland traffic light. At a distance of only 60 feet from the intersection, Cpl. Hampton described the southernmost Portland traffic signal as being "invisible behind there[.]" Cpl. Hampton also testified that simply knowing that an intersec-

tion has a traffic signal is not enough; the driver must be able to see the signal in order to determine whether the light is red, yellow or green.

Taylor later gave a statement under oath in which she said the collision "was the result of me not being able to see the stop light at the intersection of Grant and Portland. The stop light was obscured by other objects present at this intersection." She pled guilty in municipal court to disobeying a solid red light. There was a loop detector switch on Portland to detect vehicles and change the traffic light from red to green. This device consisted of wires buried in the pavement at the stop bar and extending back over an area 6 × 30 feet in dimension. If a vehicle stopped at a red light on Portland, the device would detect the vehicle and notify the controller to change the Portland traffic light to green. The City had no records from the loop detector device showing that Taylor's car had stopped at the red light on Portland before the collision occurred.

At one time, the Grant–Portland intersection was a four-way stop. A city ordinance requires that "[a]ll traffic control signs, signals and devices shall conform to the most recent edition of the Manual on Uniform Traffic Control Devices." [2] In June 1982, stoplights were installed at that intersection by the City's public works employees. The design and placement of the traffic lights at that intersection was approved by the City's traffic engineer, Earl Newman. The 1978 version of the Manual required the City to have two traffic lights for drivers headed west on Portland. This version of the Manual also required that a driver headed west on Portland have a continuous view of the two traffic signals for 270 feet. This visibility requirement applies "unless precluded by a physical obstruction or there is another signalized intersection within this range." The Manual further provides that "[w]here the visibility requirements in Table 4–1 [requiring 270 feet for a street with a 30 m.p.h. speed limit] cannot be met, a suitable sign shall be erected to warn approaching traffic." The City knew that, as designed by Newman in June 1982, this intersection did not meet the 270–foot visibility requirement. [3] Because the Manual requirement had not been met, the City installed the "signal ahead" sign.

After the traffic lights were installed in 1982, city employees went to the intersection on numerous occasions to perform inspections, maintenance and repairs. The last such visit occurred on August 6, 2001. During the five-year period before Lampe was injured, the City was aware that there had been four other virtually identical collisions that resulted from a driver running the red light while westbound on Portland.

In January 2002, Newman inspected the accident site and had photographs made of the westbound Portland approach to the intersection. The photographs were at 50–foot intervals from 500 to 100 feet away from the intersection. These photographs showed that the trees on the north side of Portland had lost virtually all of their leaves. Even with all of the foliage gone, a driver headed west on Portland could see both traffic signals only intermittently between 270 and 131 feet from the intersection. Between 200 and 250 feet from the intersection, there was a 25–foot zone where neither traffic signal was visible.

**2.** This requirement is contained in § 106–151 of the *Springfield Municipal Code*. The earlier version of this ordinance was codified in § 22–52 and § 22.52.1 of the 1981 edition of the Code.

**3.** The Millennium Edition of the Manual, which was issued in June 2001, contained the same 270–foot visibility requirement.

During the wintertime, a westbound driver could not see both traffic signals further than 131 feet from the intersection. From 1982 through the date of the crash, Newman agreed that there had never been a time when the two traffic signals for westbound drivers on Portland had been continuously visible for 270 feet.

Lampe's expert witness, Dr. John Glennon (Dr. Glennon), was a traffic engineer with 45 years of experience. This expertise included issues relating to traffic signal safety, sight distance and visibility. Dr. Glennon testified that the Manual was an authoritative publication which set minimum standards for traffic signs, signals and markings. It contained minimum standards concerning visibility for intersections controlled by traffic lights. Dr. Glennon opined that it would be a breach of the standard of care for an engineer to fail to follow the Manual in designing and maintaining an intersection. The Manual specifies that traffic signals shall have the maximum available visibility. In designing an intersection, vegetation also must be considered to achieve maximum visibility. For a street like Portland with a 30 m.p.h. speed limit, the Manual requires that both traffic lights for westbound drivers be continuously visible for a minimum of 270 feet.

Dr. Glennon opined that the City did not comply with that requirement. In December 2001, Dr. Glennon had gone to the intersection to inspect, photograph and measure it. To understand the physical conditions at the accident site around the time of the collision, he also viewed Ex. 90. Based upon these observations, Dr. Glennon concluded that the two red lights for westbound drivers on Portland were not continuously visible at least 270 feet from the intersection. Various obstructions like foliage, utility poles and the nearer traffic signals on Grant intermittently blocked a driver's view of the right, left or both Portland signals. These conditions would have been obvious to any City employee who visited the intersection between the time it was built and the date of the accident. The City's failure to comply with the Manual made the westbound Portland approach to the intersection dangerous. The dangerous condition of the intersection either caused or contributed to cause the collision.

According to Dr. Glennon, this dangerous condition could have been remedied before the Lampe collision occurred. The 270-foot continuous visibility requirement could have been met by: (1) turning the nearer traffic lights on Grant to face Portland; (2) turning the farther traffic lights on Portland to face Grant; (3) mounting the signal devices on the inside of the posts to be closer and more visible to drivers; and (4) rewiring the signals to operate properly. This would have complied with the requirements of the Manual and prevented the traffic lights for drivers on Portland from being obstructed. The estimated cost of repairs was between $1,000 and $2,000. Providing maximum visibility of the two red lights on Portland could help prevent an inattentive driver from running a red light at that intersection. Dr. Glennon concluded that, if the signal heads for westbound Portland drivers had been mounted so as to provide at least 270 feet of continuous visibility, the collision could have been prevented. Having two visible signals would have given Taylor twice the chance of seeing the red light.

Dr. Glennon also opined that the City's placement of the "signal ahead" sign did not satisfy the City's obligation to comply with the Manual. The Manual requires that the minimum continuous visibility distance be provided unless an obstruction like a curve or a building makes compliance with that requirement impossible. If

it is possible to provide the minimum continuous visibility, placing a warning sign instead is not in compliance with the Manual. Because the 270–foot continuous minimum visibility for the westbound Portland traffic lights could have been provided, the City's "signal ahead" sign did not comply with the Manual. Dr. Glennon also opined that a driver only had a brief opportunity to see the "signal ahead" sign before passing by it because of overhanging vegetation. The close proximity of this sign to the school crossing sign, which was only 40 feet further down the road, also made it difficult for a driver to process the information on the two signs. This problem was exacerbated by the fact that the "signal ahead" sign was further away from the street and less visible than the bright yellow school crossing sign. The intersection was still dangerous despite the presence of the "signal ahead" sign.

The City called Thomas Dancey (Dancey) as an expert witness. He was a licensed civil engineer who had worked as a traffic engineer for the City at one time. He inspected the intersection in January 2002, and he was familiar with the Manual. Dancey agreed that: (1) the Manual's primary goal for traffic signals was to provide maximum visibility; (2) the Manual required two traffic signals for westbound drivers on Portland; (3) one reason for requiring two lights was to give an inattentive driver twice the chance to see the light; and (4) if the traffic lights for westbound Portland drivers could be made visible for 270 feet, no warning sign was required. Based upon Dancey's inspection of the intersection, he concluded that the traffic signals for westbound Portland drivers did not meet the Manual's requirement of being continuously visible for at least 270 feet. A westbound driver on Portland could not see both signals until he or she was 131 feet away from the intersection. Dancey agreed that the "sig-

nal ahead" sign would not tell a westbound driver what color the traffic light would be when he or she reached the intersection. He also acknowledged that the visibility of traffic signals can be affected by vegetation. The fact that a driver knows an intersection has a traffic light does not tell the driver what color the light will be on approach to that intersection.

The jury returned a verdict in favor of Lampe and assessed 85% of the fault to Taylor and 15% of the fault to the City. This appeal followed. Additional facts necessary to the disposition of the case are included below as we address the City's three points of error.

## Point I

In Point I, the City contends the trial court erred by overruling the City's motion for judgment notwithstanding the verdict. *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588 (Mo. banc 2007) contains a concise summary of the applicable standard of review:

> The standard of review of denial of a JNOV is essentially the same as for review of denial of a motion for directed verdict. A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. In determining whether the evidence was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict. [An appellate court] will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. Accordingly, a motion for JNOV is properly granted when the motion identifies at least one element of

the plaintiff's case that is not supported by the evidence.

*Id.* at 590 (citation omitted).

Missouri law provides two express waivers of sovereign immunity for public entities. In relevant part, § 537.600 states:

[T]he immunity of the public entity from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following instances: . . . (2) Injuries caused by the condition of a public entity's property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred, and that either a negligent or wrongful act or omission of an employee of the public entity within the course of his employment created the dangerous condition or a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

§ 537.600.1(2).[4] A waiver under § 537.600.1(2) is absolute. § 537.600.2. In order to make a submissible case against the City, Lampe bore the burden of proving the following elements: (1) the City's property was in a dangerous condition at the time of the injury; (2) Lampe's injury directly resulted from the dangerous condition; (3) the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury that was incurred; and (4) a public employee negligently or wrongly created the condition within the

course of employment, or that the public entity had actual or constructive notice of the dangerous condition in time to have acted. *See Maune ex rel. Maune v. City of Rolla,* 203 S.W.3d 802, 804 (Mo.App. 2006).

The City argues that Lampe failed to present substantial evidence that any negligence on the part of the City caused Lampe's damages because: (1) Taylor knew the intersection had a traffic signal; and (2) no amount of engineering can prevent a driver from entering an intersection against a red light.[5] We disagree.

■■■ The question of whether the dangerous condition was the direct cause of the accident is the same as whether it was the proximate cause. *Hensley v. Jackson County,* 227 S.W.3d 491, 496 (Mo. banc 2007). Proximate cause must be decided on the specific facts of each case by evaluating "whether an injury is the natural and probable consequence of the defendant's negligence." *Stanley v. City of Independence,* 995 S.W.2d 485, 488 (Mo. banc 1999). Causation is normally decided by the trier of fact. *Kraus v. Hy–Vee, Inc.,* 147 S.W.3d 907, 918 (Mo.App.2004); *Williams v. Missouri Highway and Transportation Comm'n,* 16 S.W.3d 605, 611 (Mo.App.2000).

■■■ While Taylor may have known that the intersection was controlled by a traffic light, the evidence favorable to the judgment demonstrated that she did not know what color the traffic light was when she arrived at the intersection. Cpl. Hampton testified that Taylor said she "did not see the signal at Grant was red." In Taylor's later written statement, she

**4.** All references to statutes are to RSMo (2000) unless otherwise specified.

**5.** During the presentation of the City's evidence, the court admitted Taylor's deposition

in evidence. It included testimony that Taylor knew the intersection at Portland and Grant was controlled by a stoplight.

said the collision "was the result of me not being able to see the stop light at the intersection of Grant and Portland. The stop light was obscured by other objects present at this intersection." Taylor's negligence in failing to see the red traffic signal and stop at the intersection does not preclude the City from being held liable. It is well-settled that a driver's concurring negligence does not bar a recovery against the public entity. *See, e.g., Huifang v. City of Kansas City,* 229 S.W.3d 68, 76–77 (Mo.App.2007); *Kraus,* 147 S.W.3d at 919; *United Missouri Bank v. City of Grand-view,* 105 S.W.3d 890, 900 (Mo.App.2003); *Williams,* 16 S.W.3d at 612. Evidence that the concurrent negligence of Taylor and the City caused Lampe's injuries warranted an apportionment of fault between the responsible parties. *Kraus,* 147 S.W.3d at 919; *United Missouri Bank,* 105 S.W.3d at 900. We reject the City's argument that its intersection must be dangerous to a negligence-free driver in order to constitute a dangerous condition as defined in § 537.600. *See Fox v. City of St. Louis,* 823 S.W.2d 22, 24 (Mo.App. 1991), *overruled on other grounds by Hensley v. Jackson County,* 227 S.W.3d 491, 495–96 (Mo. banc 2007). Here, the jury reasonably could have found that Taylor's failure to see the red traffic signal was the natural and probable consequence of the City's negligent failure to follow the Manual's signal visibility requirements.

The City's argument that it could never prevent all accidents resulting from red light violations misses the mark. The relevant issue here is whether Lampe presented substantial evidence that this collision could have been prevented. We hold that she did. During the five-year period before Lampe was injured, the City was aware that there had been four other virtually identical collisions that resulted from a driver running the red light while westbound on Portland. Dr. Glennon tes-

tified that providing maximum signal visibility helps stop the accidental or inadvertent running of red lights. He opined that: (1) the City failed to meet the standard of care in designing the intersection because the two signals were not continuously visible for 270 feet as required by the Manual; (2) the City's failure made the westbound Portland approach to the intersection dangerous; (3) the dangerous condition of the intersection either caused or contributed to cause the collision; (4) the dangerous condition could have been remedied prior to the collision; and (5) if the signal heads for westbound Portland drivers had been mounted so as to provide at least 270 feet of continuous visibility, this collision could have been prevented. Dr. Glennon's testimony was sufficient to make a submissible case on the issue of causation. *See Boney v. Worley,* 261 S.W.3d 641, 646–47 (Mo.App.2008); *Huifang,* 229 S.W.3d at 76–78; *United Missouri Bank,* 105 S.W.3d at 901–02. Point I is denied.

### Point II

In Point II, the City again contends the trial court erred by overruling the City's motion for judgment notwithstanding the verdict because Lampe failed to present substantial evidence that the City created a dangerous condition at the intersection or had notice of a dangerous condition in time to abate, remove or remedy same. The City argues that its placement of the "signal ahead" sign complied with the requirements of the Manual. We disagree.

As noted above, the applicable standard of review requires us to view the evidence "in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Clevenger v.*

*Oliver Ins. Agency, Inc.,* 237 S.W.3d 588, 590 (Mo. banc 2007). So viewed, the City's argument has no merit.

The City had adopted an ordinance requiring its traffic signals to conform to the most recent edition of the Manual. City employees installed the stoplights at the intersection in June 1982 as directed by traffic engineer Newman. The City was aware that the placement of the signals did not provide a driver headed west on Portland with a continuous view of the signals for 270 feet as required by the Manual. Because this requirement had not been met, the City installed the "signal ahead" sign. Newman and Dancey testified that the placement of the sign satisfied the Manual's requirements.

Dr. Glennon, however, gave contrary testimony. Insofar as relevant here, the Manual states that the 270–foot visibility requirement applies "unless precluded by a physical obstruction...." According to Dr. Glennon, the Manual requires that the minimum continuous visibility distance be provided unless an obstruction like a curve or a building makes compliance with that requirement impossible. Here, it was the City's own placement of the signals that created the obstructed view. Because the 270–foot continuous minimum visibility for the westbound Portland traffic lights could have been provided, Dr. Glennon opined that the City's "signal ahead" sign did not comply with the Manual. Dr. Glennon also opined that a driver only had a brief opportunity to see the "signal ahead" sign before passing by it because of overhanging vegetation. This overhanging vegetation would. have been apparent to City workers, who had been at the intersection as recently as August 6, 2001. In addition, Dr. Glennon testified that the close proximity of this sign to the school crossing sign, which was only 40 feet further down the road, also made it difficult for a driver

to process the information on the two signs. This problem was exacerbated by the fact that the "signal ahead" sign was further away from the street and less visible than the bright yellow school crossing sign. Dr. Glennon opined that the intersection was still dangerous despite the presence of the "signal ahead" sign.

■ Here, the parties presented conflicting expert testimony about whether the City's placement of the "signal ahead" sign complied with the requirements of the Manual and thereby met the applicable standard of care. It was up to the jurors to determine the weight and believability of this expert testimony. *Friend v. Yokohama Tire Corp.,* 904 S.W.2d 575, 576 (Mo.App.1995). It appears the jury resolved that conflict in Lampe's favor and found Dr. Glennon's testimony more credible than that provided by Newman and Dancey. "It is well established that credibility determinations are jury questions and not for the court to decide." *Lomax v. DaimlerChrysler Corp.,* 243 S.W.3d 474, 483 (Mo.App.2007). Point II is denied.

### Point III

■ In Point III, the City contends the trial court erred in admitting and excluding certain evidence relating to Lampe's damages. The following facts are relevant to our discussion of this point.

During Lampe's case-in-chief, she presented testimony from Dr. Cary Marquis (Dr. Marquis) concerning the treatment Lampe had received for injuries she sustained in the collision. Dr. Marquis had reviewed Ex. 95, which was a summary of Lampe's medical bills. Dr. Marquis testified that the charges for Lampe's treatment were fair, reasonable and necessary. The City objected to the admission of Ex. 95 on the ground that Lampe was not actually obligated to pay the bills listed in the exhibit. The trial court overruled the

objection. Ex. 95 showed that Lampe's medical expenses totaled $134,322.71.

During a subsequent offer of proof, the City presented evidence that: (1) the Missouri Medicaid program had paid $13,016.14 of Lampe's medical expenses; and (2) the health care providers were required by law to write off the remaining charges. The trial court ruled this evidence was inadmissible pursuant to the collateral source rule and excluded it. The City contends the trial court's ruling was an abuse of discretion because it involved a misapplication of the collateral source rule. The City argues that its inability to present the foregoing evidence resulted in Lampe receiving a windfall from the jury. We disagree.

■■■ We review the trial court's decision to exclude evidence for an abuse of discretion. *Beaty v. St. Luke's Hosp. of Kansas City*, 298 S.W.3d 554, 558 (Mo. App.2009). "An abuse of discretion occurs when the court's ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* To recover past medical expenses as special damages, Lampe bore the burden of proving the necessity and reasonableness of those expenses. *See Long v. Missouri Delta Medical Center*, 33 S.W.3d 629, 640 (Mo.App. 2000) *abrogated on other grounds by State Bd. of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146, 153 (Mo. banc 2003); *Williams v. Jacobs*, 972 S.W.2d 334, 342 (Mo.App.1998). She did so through the testimony of Dr. Marquis. The admissibility of the City's proffered evidence concerning Medicaid payments and write-offs was governed by the version of § 490.715 in effect before its amendment in 2005.[6] That version of the statute stated:

1. *No evidence of collateral sources shall be admissible other than such evidence provided for in this section.*

2. If prior to trial a defendant or his insurer or authorized representative, or any combination of them, pays all or any part of a plaintiff's special damages, the defendant may introduce evidence that some other person other than the plaintiff has paid those amounts. The evidence shall not identify any person having made such payments.

3. If a defendant introduces evidence described in subsection 2 of this section, such introduction shall constitute a waiver of any right to a credit against a judgment pursuant to section 490.710.

4. This section does not require the exclusion of evidence admissible for another proper purpose.

§ 490.715 (emphasis added).

■■■ "The collateral source rule is an exception to the general rule that damages in tort are compensatory only." *Smith v. Shaw*, 159 S.W.3d 830, 832 (Mo. banc 2005). The general purpose of this rule is to prevent a wrongdoer from mitigating damages by proving that payments were made to the plaintiff from a collateral source. *Buatte v. Schnuck Markets, Inc.*, 98 S.W.3d 569, 573 (Mo.App.2002). As a government benefit that is contingent upon the recipient's financial need or special status, Medicaid is a collateral source that should not be disclosed to the jury. *Wash-*

---

6. House Bill 393 amended 23 statutes, including § 490.715.2005 Mo. Laws 641–57. With one exception not relevant here, those amendments only applied to causes of action filed after August 28, 2005. § 538.305 RSMo Cum. Supp. (2005). Lampe's cause of action was filed on November 26, 2003.

*ington by Washington v. Barnes Hosp.,* 897 S.W.2d 611, 620 (Mo. banc 1995); *Porter v. Toys 'R' Us–Delaware, Inc.,* 152 S.W.3d 310, 320 (Mo.App.2004). This prohibition includes disclosure to the jury of write-offs health care providers are required to make by law because they accept Medicaid payments. *See Porter,* 152 S.W.3d at 320 (applying that same rationale to write-offs required by the Medicare program because they are not materially different than contractual write-offs required by agreements with private health insurers). Therefore, the trial court's ruling complied with the limitations imposed by § 490.715.1.

The City argues that the disposition of this point should be controlled by *Farmer–Cummings v. Personnel Pool of Platte County,* 110 S.W.3d 818 (Mo. banc 2003). We find that argument unpersuasive. *Farmer–Cummings* involved an issue of statutory construction in a worker's compensation case. The determinative issue was whether medical bills that had been written off constituted "fees and charges" the employee could recover pursuant to § 287.140. *Id.* at 820–21. This worker's compensation statute has no bearing on the application of the collateral source rule in general civil litigation, which is governed by § 490.715.1. We are not aware of any case that has extended *Farmer–Cummings* to general civil litigation in the manner suggested by the City, and we decline to do so here. Point III is denied.

The judgment of the trial court is affirmed.

BARNEY, J. and THOMPSON, Special Judge, concur.