Tan **HUIFANG** and Chen **Zhiping**,
Respondents,

v.

**CITY OF KANSAS CITY, Missouri**,
et al., Appellants.

No. WD 65086.

Missouri Court of Appeals,
Western District.

Jan. 23, 2007.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 27, 2007.

As Modified May 1, 2006.

Application for Transfer Denied
Aug. 21, 2007.

Douglas McMillan, Kansas City, MO, for appellant.

Thomas W. Wagstaff, Kansas City, MO, for respondent.

Before THOMAS H. NEWTON, P.J., ROBERT G. ULRICH, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

This is an appeal of a judgment entered on a jury verdict in a wrongful death case brought against the City of Kansas City. The action was brought by the parents of a young woman, Chen Pei, who was a student at the Conservatory of Music at the University of Missouri at Kansas City ("UMKC") when she was struck by a vehicle on February 3, 2003. At the time of the accident, Chen Pei was crossing Troost Avenue at its intersection with 53rd Street. She passed away eleven days later due to the injuries.

In the action against the City, the plaintiff parents, who are residents of China, alleged that the City was careless and negligent in the way the City controlled traffic and pedestrian movements at 53rd and Troost. The errant driver, Melieka Perkins, was not a party defendant, having settled before trial. Plaintiffs alleged that as a result of the failure of the City to locate and install proper warnings and traffic control devices, the intersection of Troost and 53rd was in a dangerous condition. Plaintiffs further allege that the

death of their daughter occurred as a direct result of the dangerous condition of the City-controlled property at 53rd and Troost.

The City pleaded the defense of governmental immunity based on section 537.600, RSMo 2000. The City maintained throughout the proceedings that the action was barred by section 537.600, because the cause of action asserted by plaintiffs was not within any exception to the immunity provided to public entities by the statute. The City also denied that any failure by the City directly caused the death, asserting that the death was attributable to the actions of others. The trial court denied the City's motions, and the claim of negligence was submitted. The jury found that the plaintiffs suffered damages due to the death of their daughter in the amount of $1,250,000. The jury found the decedent seventeen percent at fault and the City eighty-three percent at fault. The court also applied the statutory limit of liability under section 537.610, entering judgment against the City in the amount of $328,011.

The City appeals the judgment, contending that the trial court erred in its rulings as to the issue of the City's immunity. The City also contends that the plaintiffs did not prove that any condition of the property caused the death. In addition, the City complains of certain other rulings of the trial court. The City's first three points on appeal are addressed in this opinion. The fourth point, which includes assertions of trial court error as to evidentiary rulings, is resolved by summary order pursuant to Rule 84.16(b) accompanied by a memorandum to the parties. We affirm the judgment of the trial court.

The issue of whether the City is protected by governmental immunity on the facts of this case is an issue of law, which we review de novo. See Williams v. Kimes, 996 S.W.2d 43, 44–45 (Mo. banc 1999). The contention of the City that the plaintiffs failed as a matter of law to show that the condition of the road directly resulted in the death of Chen Pei is also an issue of law, which we review de novo. See id. Any dispute in the evidence as to factual matters is resolved in favor of the plaintiffs in determining whether a submissible case was made. Seward v. Terminal R.R. Ass'n, 854 S.W.2d 426, 428 (Mo. banc 1993).

We first address in this opinion the issue of whether the plaintiffs showed that the intersection of 53rd and Troost was a "dangerous condition of property" within the meaning of section 537.600. The text of section 537.600 provides as follows:

**537.600 Sovereign Immunity in effect—exceptions—waiver of**

1. Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect; except that, the immunity of the public entity from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following instances:

(1) Injuries directly resulting from the negligent acts or omissions by public employees arising out of the operation of motor vehicles or motorized vehicles within the course of their employment;

(2) Injuries caused by the condition of a public entity's property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred,

and that either a negligent or wrongful act or omission of an employee of the public entity within the course of his employment created the dangerous condition or a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition. *In any action under this subdivision wherein a plaintiff alleges that he was damaged by the negligent, defective or dangerous design of a highway or road, which was designed and constructed prior to September 12, 1977, the public entity shall be entitled to a defense which shall be a complete bar to recovery whenever the public entity can prove by a preponderance of the evidence that the alleged negligent, defective, or dangerous design reasonably complied with highway and road design standards generally accepted at the time the road or highway was designed and constructed.*

*2. The express waiver of sovereign immunity in the instances specified in subdivisions (1) and (2) of subsection 1 of this section are absolute waivers of sovereign immunity in all cases within such situations whether or not the public entity was functioning in a governmental or proprietary capacity and whether or not the public entity is covered by a liability insurance for tort.* (Emphasis added.)

The statute was first adopted in 1978 in an effort by the General Assembly to restore broad governmental immunity as it existed at common law prior to the decision of the Missouri Supreme Court in *Jones v. State Highway Commission,* 557 S.W.2d 225, 230 (Mo. banc 1977), which abolished common law sovereign immunity in Missouri. The General Assembly,

while acting to reinstate the concept of governmental immunity, specifically waived immunity in two instances: (1) negligent motor vehicle operation; and (2) the dangerous condition of a public entity's property. Section 537.600.1. The "dangerous condition" waiver was effective if:

· The property was dangerous at the time of the injury;

· The injury "directly resulted" from the dangerous condition;

· The dangerous condition created a reasonably foreseeable risk of the kind of injury incurred; and

· (1) A negligent act or omission created the dangerous condition, or (2) a public entity had actual or constructive notice of the dangerous condition in sufficient time to have taken measures to alleviate the danger.

Section 537.600.1(2); *see State ex rel Mo. Highway & Transp. Comm'n v. Dierker,* 961 S.W.2d 58, 60 (Mo. banc 1998). In 1985, the General Assembly amended the statute to add the language we have highlighted in the text above. *Donahue v. City of St. Louis,* 758 S.W.2d 50, 51–52 (Mo. banc 1988). Before 1985, it was not clear whether "dangerous condition of property" had anything to do with negligent *design* of roadways. The Missouri Supreme Court noted in 1988, however, that the 1985 amendment appeared to be a "reinstatement of the holding of *Jones* as it relates to roads and highways plus opening the door to some degree prior to *Jones.*" *Id.* at 52. The 1985 amendment thus made clear that the statute allows claims against public entities for "negligent, defective, or dangerous design" of roadways. Section 537.600.1(2). The amendment also provided a conditional defense for claims related to roadways designed prior to September 12, 1977 (the effective date of *Jones* ).[1] *Donahue,* 758 S.W.2d at 52–53.

---

**1.** In the 1985 amendment, the General As-

sembly created a complete defense for the

A further significant part of the amendment was the abolition as to all public entities (including municipalities) of any immunity based on the governmental/proprietary distinction that existed at common law. The statute clarifies that the waivers are "absolute." Section 537.600.2. The statute further provided that immunity is waived in the specific instances regardless of whether the entity is covered by liability insurance. *Id.*

### Analysis

On the appeal before us, the City contends that it was entitled to judgment as a matter of law under section 537.600 because the plaintiffs failed to plead and prove that the intersection of 53rd Street and Troost Avenue was "a dangerous condition." The City also argues that it has immunity under the common law because issues such as the location of traffic signals are discretionary and not ministerial. Next, the City argues that the death of Chen Pei was caused by the intervening negligence of Melieka Perkins (the driver) and Chen Pei (the deceased), and not by the City.

As we have already noted, section 537.600 provides that public entities are immune from liability for negligence except for (1) cases arising out of the entity's operation a motor vehicle; and (2) certain cases in which the injury was caused by the condition of the public entity's property. The City contends that the court erred in denying its motions for JNOV and directed verdict, in which it asserted these legal grounds. The plaintiffs' petition stated in pertinent part as follows:

13. At all times and places relevant herein, Troost Avenue at 53rd Street, in Jackson County, Missouri, is and was under the control of defendant City, who is and was responsible to provide adequate signing, lighting and/or patrolling and had a duty to remove any known or reasonably foreseeable dangers associated with the use of Troost Avenue by pedestrians and others.

14. At all times and places relevant herein, Defendant City, by and through the acts and omissions of its respective agents servants and employees, operating in the scope and course of their employment, was careless, reckless, negligent and at fault in causing said motor vehicle accident by not locating proper warnings, including, but not limited to flashers, stop signs, traffic signals, other warning signs and crossing guards at the time of the subject accident.

15. At all relevant times and places herein, including the time when decedent suffered fatal injuries, Troost Avenue at 53rd Street was in a dangerous condition.

16. Decedent's death was the direct result of the dangerous condition of Troost Avenue at 53rd Street.

17. The dangerous condition of Troost Avenue at 53rd Street created a reasonably foreseeable risk of harm of the kind of injury which decedent incurred.

18. At all times and places relevant herein, Defendant City knew or should have known that Troost Avenue at 53rd Street was used by students at both Rockhurst and UMKC on a regular and consistent basis.

19. At all times and places relevant herein, Defendant City knew or should have known that prior motor vehicle ac-

public entity where the entity can show that the allegedly negligent design of a road designed and constructed prior to September 1977 complied with the then applicable road design standards. The City has not attempted in this case either to plead or to prove a defense based on that portion of the amendment.

cidents involving pedestrians had occurred at Troost Avenue at 53rd Street.

20. At all times and places relevant herein, Defendant City of Kansas City, Missouri, carelessly, recklessly, and negligently failed to properly maintain a pedestrian crosswalk that allowed safe passage across Troost Avenue at 53rd Street for the amount and type of use that it received.

21. Defendant City knew or should have known of the dangerous condition in sufficient time prior to the injuries suffered by the decedent to have taken measures to protect against said dangerous condition.

22. As a direct and proximate result of the aforesaid carelessness, negligence, recklessness and fault of Defendant City, decedent was fatally injured.

The City takes the position that plaintiffs' case falls short of alleging a cause of action, but fails to specify what is lacking in the petition. As far as we can see, the petition recites all elements of the waiver. The City next argues that the waiver was not proven because this case involves the actions of a third party, Melieka Perkins, whose own negligent actions constituted an intervening act of negligence. The City points out that Melieka Perkins approached the intersection on the day in question without observing the crosswalk or crosswalk sign. The street was damp because it had been misting or lightly raining. The sky was, of course, overcast. When the traffic in the left lane in front of her stopped, she pulled out and over into the right lane and accelerated to go through the intersection. She did not notice the crosswalk lines painted in the street. She also did not notice to her right a sign indicating the existence of a crosswalk. She had earlier noticed a school zone sign as she approached 52nd Street from the north, but she assumed that after she passed 52nd Street she was past the special school zone. As she reached 53rd Street, just before impact, she caught a glimpse of a young woman's "hair flopping" as Chen Pei came across the crosswalk, apparently scurrying or jogging across the crosswalk.

The City points out that Ms. Perkins failed to drive with the highest degree of care, failed to approach the intersection with caution, failed to recognize that she was still in a 25 miles-per-hour school zone, failed to observe the crosswalk and the crosswalk sign, and failed to keep a careful lookout for pedestrians. The City argues, therefore, that Ms. Perkins' negligent driving was, as a matter of law, an intervening cause that precluded submission of the claim. The City cites *State ex rel. City of Marston v. Mann*, 921 S.W.2d 100, 102 (Mo.App.1996), for that proposition.

The allegation in *Marston* was that injuries caused by motorists who were "drag racing" on the city street were caused by a "dangerous condition" because the drag racing was dangerous. *Id.* at 101. The allegation was that the City was negligent in failing to install traffic control devices so as to keep people from drag racing. *Id.* The court in *Marston* did not consider the pleading of the "dangerous condition" to amount to a pleading of a "negligent, defective or dangerous design, whose very existence posed a physical threat" to plaintiffs. *Id.* at 104. The court also determined that the injuries alleged did not result from deficiencies in the road but from the actions of two individuals drag racing. *Id.* The court thus held that the petition was inadequate and should be dismissed. *Id.*

The City also discusses *Hedayati v. Helton*, 860 S.W.2d 795 (Mo.App.1993), and *Johnson v. City of Springfield*, 817 S.W.2d 611 (Mo.App.1991), to support its conten-

tion. In both cases, a child was struck and killed while trying to walk across a street. In *Johnson*, the allegation was that the road was dangerous because of the volume of traffic, because many children played in the area, and because vehicles were parked along the street, blocking the view of the drivers and of the children. 817 S.W.2d at 612. Plaintiffs contended that the children were inadequately warned of the danger, and also contended that the posted 30 m.p.h. speed limit was too great for the conditions. *Id.* The petition also contended that there had been complaints and that the City was on notice of the dangers. *Id.* In *Hedayati*, it was similarly alleged that the street was dangerous at the place in question because there were no traffic control devices in that area of the road, and no sign or traffic control devices on the private road which intersected with the street at that vicinity. 860 S.W.2d at 796. This court in *Hedayati* relied heavily on *Johnson*, holding that the allegations in the petition did not plead facts amounting to an assertion that the *condition* of the road posed a physical threat to the child. *Id.* at 797.

The only other authorities cited by the City on this point are (1) *Twente v. Ellis Fischel State Cancer Hospital*, 665 S.W.2d 2, 4 (Mo.App.1983), which involved a woman raped in the parking lot of the hospital who alleged the state was liable because a security guard was not at his post; and (2) *Alexander v. State of Missouri*, 756 S.W.2d 539, 540–41 (Mo. banc 1988), which involved injuries directly caused to a contractor's employee servicing elevators in a state office building when a state employee created a dangerous condition by placing a folding room partition at the foot of the ladder on which the repairman was working. In *Twente*, the claim was dismissed because the rape and assault were directly and proximately caused by the intentional criminal activity of a third party, not by

the condition or design of the parking lot. 665 S.W.2d at 11–12. In *Alexander*, the Court held that a cause of action was stated by the pleading of facts indicating that the actions of a state employee created a dangerous condition of property which directly caused the injury in question. 756 S.W.2d at 542. The City cites *Alexander* for the Court's language stating: "the condition here was dangerous because its existence *without intervention by third parties*, posed a physical threat to plaintiff." *Id.* at 542 (emphasis added).

The City argues that these authorities mandate an outright reversal of the judgment in this case. If the law were as simple as the City asserts, we would be inclined to agree. There are, however, a number of authorities that are pertinent to the facts of this case which are not discussed or mentioned by the City. The City did not in its brief discuss any decision of the Missouri Supreme Court except for a passing reference to some of the language in *Alexander, supra*. The City did not discuss *Donahue v. City of St. Louis*, 758 S.W.2d 50 (Mo. banc 1988) (making clear that the Missouri Supreme Court construed section 537.600 as including traffic control devices within the concept of "road design"). The City also did not address the cases of *Wilkes v. Missouri Highway & Transportation Commission*, 762 S.W.2d 27 (Mo. banc 1988); *Moore v. Missouri Highway & Transportation Commission*, 169 S.W.3d 595 (Mo.App.2005); *Kraus v. Hy–Vee, Inc.*, 147 S.W.3d 907 (Mo.App.2004); *United Missouri Bank, N.A. v. City of Grandview*, 105 S.W.3d 890 (Mo.App.2003); *Williams v. Missouri Highway & Transportation Commission*, 16 S.W.3d 605 (Mo.App.2000); or *Cole v. Missouri Highway & Transportation Commission*, 770 S.W.2d 296 (Mo.App. 1989), all of which involved claims of dangerous conditions of roadways caused by

allegedly improper or inadequate traffic control devices.

In its reply brief, the City attempts to respond to the plaintiffs' arguments based on *Kraus v. Hy–Vee, Inc.*, but the City does not mention *Donahue* or any other decision of the Missouri Supreme Court involving section 537.600. *See, e.g., Jones v. City of Kansas City*, 15 S.W.3d 736, 738 n. 4 (Mo. banc 2000) (holding that the concept of a "defect in the condition of" a street for purposes of section 82.210 (the notice requirement statute) is narrower than the concept of defective design of a roadway under section 537.600 (meaning that section 537.600 encompasses more than a physical defect in the pavement itself)). Thus, the City's arguments are weakened by the appearance that the City has not considered and digested all of the pertinent authorities that a reviewing court must consider. The City has not provided us with a road map as to how to distinguish such authorities from the facts before us.

█ As we have already noted, the City is incorrect in arguing that the only kind of dangerous condition giving rise to possible liability is a dangerous physical condition within the property itself, such as a defect in the pavement. *Donahue*, 758 S.W.2d at 52; *Jones*, 15 S.W.3d at 738 n. 4. Indeed, the 1985 amendment to section 537.600 and *Donahue* should have put that argument to rest. The amendment makes clear that immunity is waived for the "negligent, defective or dangerous design" of a highway or road. The Supreme Court in *Donahue* determined that traffic control devices including markings, signs, and traffic signals are part of the "design" of a roadway. 758 S.W.2d at 52. It makes sense that when a road is designed, the design engineer has in mind exactly how traffic is to be controlled on the road, anticipating and sketching into the plans the precise traffic controls dictated by the pertinent engineering requirements and the anticipated conditions. *See id.*

### Third Party Intervention

█ Our review of the law further shows that the City is incorrect in arguing that any negligence of third parties is *necessarily* a kind of "third-party intervention" that allows the City to retain its immunity. We start with the words of section 537.600 itself. The phrase "third-party intervention" is not in the statute itself. The statute, instead, simply provides for liability when *inter alia*, the injury "directly resulted from" the dangerous condition arising out of the public entity's negligence. The City cites *Alexander, Marston, Johnson,* and *Hedayati* for the use of the phrase "without intervention by third parties," in discussing the creation of the risk to the plaintiff. *Alexander,* which involved the negligent placement of the folding partition, was a case that involved the negligence of a state employee only. 756 S.W.2d at 540–41. The Court in *Alexander* may simply have wished to make clear that the state was not a guarantor of the safety of its property as against the actions of third parties. If a third-party actor had placed the partition at the foot of the ladder, the injury would not, without some concurring negligence by the state in failing to deal with the risk, have "directly resulted from" a negligent act of the state. *See id.* at 541–42.

The "third party intervention" language was used in *Marston,* the drag racing case, to uphold the City's immunity where the third parties were directly responsible for the injuries by their intentional conduct of drag racing in spite of the obvious risk it created. 921 S.W.2d at 104. *Johnson* and *Hedayati,* though using the same phraseology, based their rulings on the fact that there was no physical aspect of the road-

way which was dangerous because of its very existence without third-party intervention. *See Johnson,* 817 S.W.2d at 613–14.

In case there was doubt as to what was meant by "third-party intervention" in those cases, the Supreme Court, in *State ex rel. Missouri Highway & Transportation Commission v. Dierker,* 961 S.W.2d 58, 60 (Mo. banc 1998), clarified the matter by addressing the meaning of the phrase "directly resulted from" in the statute. The Court determined that the phrase "directly resulted from" is "synonymous with 'proximate cause.'" *Id.* The Court then stated that "[t]he practical test of proximate cause is generally considered to be whether the negligence of the defendant is that cause or act of which the injury was the natural and probable consequence." *Id.* The Court distinguished proximate cause from "but for" causation, indicating that proximate cause requires "but for" causation but is narrower than "but for" causation. *Id. (quoting Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852, 865 (Mo. banc 1993)). The Court restated the view that "directly resulted from" is synonymous with "proximate cause" in *Stanley v. City of Independence,* 995 S.W.2d 485, 488 (Mo. banc 1999). *See also Robinson v. Mo. State Highway & Transp. Comm'n,* 24 S.W.3d 67, 78 (Mo.App.2000).

The City, although not discussing *Dierker,* seems to believe that anytime the negligence of a third party figures into the injury, the City is not liable, regardless of the probability and predictability of the third-party negligence, and regardless of how related to the City's negligence. The court in *Dierker,* as we have noted, described the meaning of the phrase "directly resulted from," indicating it is the same as the concept of "proximate cause." *Id.* at 60.

## "Third Party Intervention" is a Test of Proximate Cause

Because the phrase "directly resulted from" in section 537.600.1(2) is synonymous with proximate cause, the concept of third-party intervention is necessarily the same as the concept of third-party intervention in the common law tort context. In *Smith v. Coffey,* 37 S.W.3d 797, 801 (Mo. banc 2001), the Supreme Court specifically rejected the notion that there is a special set of tort-causation rules when the defendant is a public entity.

> The General Assembly expressed no intent to create a new set of tort rules applicable only to state agencies by its use of the words "directly resulted" in the statutes granting the limited waiver of tort immunity. Rather, it intended that to the extent of the waiver, normal tort rules of liability and causation would be applicable.

*Id.* at 801. This is illustrated in *United Missouri Bank v. City of Grandview,* 105 S.W.3d 890 (Mo.App.2003). In that case, a plaintiff asserted a claim against the City for allegedly negligent roadway design and failure to control traffic. *Id.* at 894. After considering the apparent negligence of a driver who pulled directly in front of a motorcycle causing injuries to the cyclist, the trial court granted the City's motion for summary judgment. *Id.* at 895. This court reversed the summary judgment ruling, however, because there were sufficient conflicts concerning the facts, so that the causation remained a jury issue. *Id.* at 901–02. In addition, this court, in commenting on the intervening cause issue, quoted *Heffernan v. Reinhold,* 73 S.W.3d 659, 665 (Mo.App.2002):

> "An efficient, intervening cause is a new and independent force which so interrupts the chain of events that it becomes the responsible, direct, proximate, and immediate cause of the injury, but it

may not consist of merely an act of concurring or contributing negligence." *Id.* at 900. The court said that even if it were undisputed that the driver operated his vehicle in negligent fashion, that evidence did not, *in and of itself,* establish that the condition of the intersection could not also have been a proximate and concurrent cause of the accident. *Id.* The court also cited five other appellate decisions indicating that concurring third-party negligence did not necessarily preclude the liability of the public entity. *Id.* at 900–01.

In view of the foregoing, we conclude that the City's analysis, which ignores a large body of case law, falls short of persuasiveness. The law clearly is that the General Assembly has waived governmental immunity for negligence by a public entity that creates a dangerous condition under the circumstances detailed in the statute. It is also clear, since the 1985 amendment to the statute, and since *Donahue,* that a public entity can have liability for the negligent design or construction of a roadway, including the negligent design and placement of traffic control devices. It is also clear that the concurring negligence of a third party does not preclude the liability of the public entity unless the third-party negligence is such as to constitute an efficient and independent intervening cause of the injury. Therefore, we reject the City's first contention.

### Immunity for Discretionary Determinations

█ The City also contends that it was immune from suit under the common law in that the placement of traffic signals is a discretionary matter. The City contends

that the statute does not waive immunity for discretionary governmental functions. It argues that the placement of traffic controls at 53rd Street was a legislative determination of the City Council.

The City's argument would appear to have been defeated twenty years ago by the 1985 amendment to section 537.600. The 1985 amendment, in referring to the waivers of governmental immunity for motor vehicle negligence and dangerous condition of property, including defective roadway design, states that the waivers are "absolute waivers of sovereign immunity." Section 537.600.2; *see Donahue,* 758 S.W.2d at 51–52. Thus, for the specified instances of waiver, every aspect of governmental immunity is waived. Therefore, even if the record were to show that the City Council itself had actually deliberated on how to design and mark the intersection at 53rd and Troost, and had exercised its discretion in the issuance of a special ordinance, such fact would not provide immunity to the City's decision, if such decision were negligent and involved the creation of a dangerous condition.

The notion that there was any legislative discretion involved in the decision as to the placement of the traffic control devices did not seem to be asserted in the pleadings or the evidence. The City cites no portion of the transcript or any evidence to the effect that traffic control at 53rd and Troost involved legislative discretion. Mr. Tony Nasseri, a traffic engineer for the City, did not testify that the City Council had determined how to mark 53rd Street. Rather, he acknowledged that the City had adopted the Manual on Uniform Control Devices ("MUTCD" or "Manual")[2] to

2. The MUTCD approved by the Federal Highway Administration of the U.S. Department of Transportation is "the national standard for all traffic control devices installed on any street, highway or bicycle trail" of the federal government and any "federal-aid projects." *See* 23 C.F.R. §§ 655.603, 630(a)(2003). Twenty-four states, including Missouri, have

guide its traffic engineering decisions. While the manual does not entirely dispense with engineering judgment, it sets forth standards for traffic control design, which are uniformly to be followed by those jurisdictions which have adopted it. Accordingly, the City traffic engineers are required by the City to comply with the Manual when the Manual has specific requirements. Thus, for all these reasons, we reject the notion that the way the intersection was designed is protected by the discretionary immunity of legislative bodies.

### Condition of 53rd and Troost

In Point III, the City asserts that the plaintiffs failed to establish that the *condition of the intersection* caused or contributed to Chen Pei's death, because the evidence showed the accident was caused by the negligence of Melieka Perkins and Chen Pei.

To determine whether the plaintiffs made a submissible case against the City on the element of whether the death "directly resulted from" the City's negligence, we must consider the evidence in the light most favorable to the plaintiffs, giving the plaintiffs the benefit of all reasonable inferences and disregarding the defendant's evidence except insofar as it may aid the plaintiffs' case. *Nemani v. St. Louis Univ.*, 33 S.W.3d 184, 185 (Mo. banc 2000). The causation requirement is an element of the "dangerous condition" exception to the sovereign immunity waiver.

*See Dierker*, 961 S.W.2d at 61. If the plaintiff fails to show causation, the plaintiff has not shown that immunity is waived and the claim is barred. *See id.*

Our review of the evidence in this case shows an intertwining of the evidence as to dangerous condition, negligence, and causation. Therefore, it will be necessary to summarize some of the portions of the plaintiffs' evidence as to these concepts.

The evidence showed that Chen Pei, a student at the Conservatory, located west of Troost Avenue, lived in a residence hall at Rockhurst University, which is east of Troost. Troost is a major traffic artery running north and south. St. Francis Xavier Elementary School is located on the west side of Troost at 53rd Street, with its entrance on 53rd Street. UMKC is located to the west of St. Francis School. St. Francis Church is located north of the school at 52nd and Troost, across Troost from Rockhurst University and to the east of UMKC.

Several years before Chen Pei's accident, Rockhurst College had undertaken a reconfiguration of certain parts of the campus. Rockhurst moved the primary vehicular access to 54th Street, and obtained permission to close 53rd Street east of Troost to vehicular traffic, using that portion of 53rd Street only for pedestrian traffic. Thus, 53rd Street west of Troost is one-way eastbound, with a stop sign at Troost for eastbound traffic.

---

adopted the national MUTCD. Twenty-one other states have adopted the MUTCD, within an accompanying state supplement. Four other states have a state MUTCD in conformance with the national MUTCD, 2003 edition. The Missouri Department of Transportation (MoDot) adopted the MUTCD with the approval of the Missouri State Highway Commission. *See* http://MUTCD.fhwa.dot.gov/knowledge/natl_adopt_2000_2003.htm. Mr.

Nasseri admitted at one point that the City had adopted the MUTCD "as law." Then he attempted to back away from that admission; then re-affirmed it. Under our standard of review for determining whether the plaintiffs made a submissible case, we must review the evidence and the inferences in a light favorable to the plaintiffs. *Seward v. Terminal R.R. Ass'n*, 854 S.W.2d 426, 428 (Mo. banc 1993).

At the time of this collision, there were regular stop lights at 52nd Street and at 54th Street on Troost. The only traffic control at 53rd Street for northbound and southbound traffic on Troost was a crosswalk and a crosswalk sign. At 52nd and Troost, one long block north of 53rd Street, there was, in addition to the stop light, a school crossing sign and a crosswalk. There was also a sign a substantial distance in advance of 52nd and Troost giving notice of a school zone and a 25 m.p.h. speed limit. That sign would flash during applicable times of the school day.

Mr. Tony Nasseri, a traffic engineer for the City, acknowledged that there were two universities, one elementary school, and one church all located at or near the area between 52nd and 54th Streets on Troost Avenue. Mr. Nasseri acknowledged that Rockhurst University contracted with HNTB, an engineering firm, for a traffic study, which was completed in 1999 and provided to the City. That study suggested, *inter alia,* that although the main vehicular entrance to Rockhurst would be shifted to 54th Street, the intersection of 53rd and Troost would continue to serve pedestrians who cross Troost Avenue. The study stated that "a pedestrian push-button signal should be studied further to provide the safest environment for pedestrians and motorists." Mr. Nasseri acknowledged that Rockhurst University offered to fund the installation of such a signal. Mr. Nasseri could not say whether, in spite of the University's request, any traffic study was done to see if such a signal were warranted.

The evidence showed that earlier the City had similar requests. In October 1997, Patrick Schilling, associated with St. Francis School, submitted to the City a request for a "traffic light or flashing school zone light" at the intersection of 53rd and Troost. The City's paperwork concerning the request for the school speed limit flashers was marked "funded." However, although a flasher sign was later installed north of 52nd Street, no school speed limit flashers and no school crossing advance sign, with or without flashers, was installed at or before the 53rd and Troost crosswalk. At about the same time as the request by Mr. Schilling, a similar request was submitted by Bridget Kilroy Hoffman, then an education student at Rockhurst. Ms. Hoffman and other college students were involved with a project at St. Francis. They frequently attempted a pedestrian crossing of Troost at 53rd Street at the crosswalk. Because of the difficulty and danger of crossing, she said, they also filled out a request for a stop light to be put in at 53rd and Troost. She said there was a "considerable amount of pedestrian traffic." She said that crossing was difficult because of the high volume of the traffic and the speed of the traffic.

The evidence showed that in 1995, a traffic signal at 53rd and Troost was also requested in writing by another citizen, Leticia Zarate.[3] The evidence further showed that in August 2001, two years before the Chen Pei accident, the City had notice of an accident involving a Rockhurst professor, Frank Smist, who was crossing Troost in or near the crosswalk at 53rd Street when he was struck by a car and reportedly suffered serious and disabling brain injuries in an accident that seemed

---

3. These requests and complaints were admitted in evidence for the purpose of showing that the City had notice of concerns of people using the intersection. This notice related in part to the issue of whether the City should have done a comprehensive engineering study, as well as to the danger. The number of accidents at the intersection (discussed *infra*) figured into whether engineering science would have indicated the need for further traffic control.

remarkably similar to the Chen Pei accident. The report stated that the driver of the offending vehicle in that case, like Melieka Perkins in this case, was reportedly driving south on Troost when a van stopped in the left lane in front of him. The driver, without knowing why the van stopped, changed to the right lane in an effort to pass the van on the right. Apparently, as in this case, the driver did not see the crosswalk lines or notice the sign at the corner indicating the presence of the crosswalk. The report states that one second before impact, the driver observed Dr. Smist walking from left to right across the front of the van. He braked and attempted to veer to the right, but reportedly could not avoid striking Dr. Smist, who was in or near the crosswalk at the time. Just like Chen Pei, Dr. Smist apparently was not closely attending to the potential danger, presumably relying on the fact that there was a crosswalk at that location. The cars that stopped had, of course, invited him to cross in front of them and waited for him to cross. Dr. Smist complied, apparently failing to appreciate the peril in which that compliance placed him.

Jenelle Chu, who also attended the UMKC Conservatory and resided in a Rockhurst dormitory at the same time as Chen Pei, testified that she sometimes, in 2003, used the crosswalk at 53rd and Troost to cross the street, depending on where the classroom was located that she was going to on that day. Sometimes she used the crosswalk at 52nd Street and Troost. Ms. Chu said that the crosswalk at 53rd Street was used by Rockhurst and UMKC students and also by students going to St. Francis School.

Mr. Nasseri acknowledged that when there is a complaint or a request for a traffic signal, the City generally conducts a comprehensive engineering study to see if a traffic light or other signal is warranted.

The City is to consider a number of "warrants," which are engineering studies based on traffic counts, pedestrians, collisions at the intersection, and other factors. The warrants are part of the science of traffic engineering and are prescribed by the MUTCD.

Mr. Nasseri acknowledged that prior to February 2003, when Chen Pei's accident occurred, no comprehensive engineering study of the intersection had been conducted by the City for over ten years. With regard to the request of Patrick Schilling of St. Francis for a school zone sign with a flashing light at 53rd Street, Mr. Nasseri could not say that an engineering study was done to see if a flashing school crossing sign was justified there. He said that a 24-hour "speed study" was done, but not an engineering study to see if a traffic signal was justified at that location. Mr. Nasseri conceded that, in view of Mr. Schilling's request and that of Ms. Hoffman, a comprehensive engineering study should have been done; if it was not done, he said, that would be a violation of the MUTCD.

### The City's Engineer Acknowledged That the Intersection Created a Danger for Students

Mr. Nasseri acknowledged that the HNTB engineers had graded the intersection of 53rd and Troost with a failing grade, an "F," for the "level of service" as to 53rd Street. He acknowledged that this meant it was extremely difficult for a car coming from the west on 53rd Street to gain access to Troost for a right or left turn because of the heavy volume of traffic. Mr. Nasseri acknowledged that the traffic on Troost left inadequate gaps to allow cars to gain access to Troost. He acknowledged this created the temptation for cars to "take a risk" by darting out in

traffic. He acknowledged that such a circumstance also created a risk for students.

Q. It endangers the lives of students, correct?

A. Yes.

Q. Now you knew that in 1999 because you received a copy of the [HNTB] study, didn't you?

A. No, I received a copy 2003, only because for this case [sic].

Q. Okay, but the City received this, right?

A. Yes.

Q. Okay. And so the City knew as of that time, that the gaps at that intersection were such that it was endangering the lives of the students, correct?

The Court: Mr. Nasseri, did you understand the question?

A. Oh, I'm sorry.

Q. The City of Kansas City knew as of that time in 1999, that because of the poor service and the lack of gaps in traffic, that it was endangering the lives of students, correct?

A. Yes.

Mr. Nasseri acknowledged that although HNTB had recommended a comprehensive engineering study to see if a push-button pedestrian signal should be installed to provide for the safety of pedestrians, the City did not do the study.

Mr. Nasseri also said the City received the report of the accident involving Dr. Frank Smist, which indicated it was a very serious accident, yet the City did nothing.

Q. In other words, even though you look at the severity of the accidents, the number of accidents, and decide whether or not maybe you need a traffic signal there, the City decided not to do a comprehensive engineering study, correct?

A. Yes.

Q. I mean at the time it had a school crossing marker there, didn't it?

A. Yes.

Q. Right over it?

A. Yes.

Q. Okay. But the question was—and by that time there had been multiple complaints about this intersection. The question was whether or not you needed to do more, maybe a flasher or a stoplight, correct?

A. Yes.

The City also maintained a list of accidents occurring at or near 53rd and Troost, in keeping with its normal monitoring of accidents. HNTB did not have the accident data when it conducted its study. The evidence showed that if HNTB had possessed the collision data (at least fifteen accidents from 1999 to 2003), the data would have supported HNTB's conclusions.

Mr. Nasseri acknowledged that, according to the MUTCD, if there was a school crosswalk, there needed also to be another sign, *in addition to the crosswalk sign itself,* in advance of the crosswalk. The so-called advance sign had the purpose of further notifying drivers that there was a school crossing ahead, in order to increase the likelihood that drivers would observe the existence of the crosswalk. With regard to the advance sign, Mr. Nasseri testified:

Q. There was not one of these advance warning signs anywhere within 700 feet of the actual crosswalk, like the manual says, correct?

A. Correct.

Q. And the reason for the advance warning sign that tells you it's ahead is to do what?

A. Is to warn the drivers the school zone and the student will cross ahead at the crosswalk.

Q. So that way in advance of this—

A. Yes.

Q. —oncoming drivers know they're coming up on a crosswalk, right?

A. Right.

Q. And a school crosswalk, right?

A. Right.

\* \* \*

Q. Okay. The closest advance warning cross sign was on the—actually, the north side of 52nd, correct?

A. Yes.

Q. And there was a crosswalk at 52nd, wasn't there?

A. Yes, yes.

Q. So that was the advance warning sign for 52nd, correct?

A. Correct.

Q. There was no advance warning sign for 53rd, was there?

A. No.

The evidence showed that a school advance sign was required in advance of the crosswalk sign under both the prior MUTCD and under the 2001 manual. The 2001 manual made a change as to the *design* of the advance sign. The City had up to ten years to implement the change as to the *design* of the sign required by the 2001 manual. The City acknowledged, however, that even under the prior manual, the *placement* of the advance sign was required in advance of the crosswalk, so that there was no dispute that the lack of an advance sign was a flaw in that the signage was not in compliance with the MUTCD.

### The City's Engineer Acknowledged that a Traffic Signal Was "Justified" at 53rd and Troost

Mr. Nasseri further acknowledged a traffic signal was justified at 53rd and Troost:

Q. We know that because of the volume of students who were at this crosswalk and because of the lack of gaps from the '99 study, that more likely than not a traffic signal was justified at that intersection as of February 3rd, 2003, correct?

A. Yes.

Q. Yes?

A. Yes.

Q. And based on your traffic engineering study and, actually, based on your traffic engineering expertise and what you do as far as going to the sites of intersections, inspecting them, watching pedestrian traffic, typically, students do not walk into an intersection if there's a traffic signal there when they don't have a green light, correct?

A. Correct.

In addition to the City's traffic engineer, the plaintiffs' traffic control expert also testified that if a comprehensive engineering study had been done as to the intersection, the study would have justified a traffic signal. He said that from May 1999 to the date of Chen Pei's accident, there were three different twelve-month periods in which there were five preventable accidents. He said that, according to the MUTCD, all that was required for the "collision warrant" for a traffic signal would be five preventable accidents in any twelve-month period. In this case, there were three twelve-month periods in which there were five preventable accidents within that four years. These accidents occurred even after the flashing "school zone" speed sign was put in north of 52nd Street. The collision history of 53rd and Troost thus showed that the flashing sign north of 52nd Street was not adequate to reduce the risks and the danger at 53rd and Troost.

Plaintiffs' expert said that there were ways to provide more safety without undu-

ly hindering the flow of traffic between 54th and 52nd Streets. He said that if minimizing the disruption of traffic was the City's concern, it could have installed a "semi-actuated signal" (a pedestrian-actuated push button signal) that is operated only when there is a pedestrian needing to cross (such as the kind recommended by HNTB). He stated that the absence of a traffic signal and the absence of an advance school crosswalk sign created a hazardous and dangerous condition to pedestrians at that location. He opined that the data showed that the advance sign north of 52nd Street was not adequate for 53rd Street, because after traveling through the light at 52nd Street, drivers would tend to incorrectly think that they were past the school zone and the school crosswalk as well, when, in fact, there was another one coming up at 53rd Street.

## The Third Party Negligence Was Not Third Party Intervention

■ The proof presented by the plaintiffs suggested that, even though Melieka Perkins was negligent, and although her negligence proximately caused the death, the City's negligence also remained proximately and directly responsible for this death. The impatience of a driver wanting to get around stopped traffic and to proceed through the intersection, failing to notice the crosswalk and the crosswalk sign, could not be called "unrelated" to the City's negligence; nor could it, on the face of this record, be regarded as so surprising, so unexpected, or so freakish as to be considered outside of the range of the natural and probable consequences of the City's actions and omissions. The plaintiffs were not precluded from submitting the issue of causation to the jury.

## The Danger of An Inadequately Marked Crosswalk

The evidence in the case and the ordinary experiences of life suggested that

existence of the crosswalk, without adequate warnings to cars, could tend to actually *enhance* the danger to the pedestrian by creating an illusion to the pedestrian that there was a zone of safety within the crosswalk. A pedestrian crossing in front of a lane of cars, particularly when the vehicles are the size of vans and sport-utility vehicles, may have difficulty seeing what is coming up in an adjacent lane, while the vehicle in the adjacent lane may have difficulty seeing the pedestrian. Therefore, it is obvious that there is a need to alert vehicles to the potential danger to pedestrians.

## Concurring Negligence

In dealing with the issue of whether Chen Pei's accident "directly resulted from" the alleged negligence of the City in failing to comply with the requirements of the MUTCD, it has been necessary to discuss the plaintiffs' evidence in some detail. Plaintiffs' extremely thorough case showed that even though Melieka Perkins was negligent in failing to observe the crosswalk and in not keeping a careful lookout for pedestrian traffic, her negligence concurred with the City's negligence so that the negligent acts of the City, Ms. Perkins, and Chen Pei were proximately and directly responsible for this injury. There was abundant evidence from which the jury could reasonably conclude that the intersection was dangerous in general, and especially dangerous for pedestrians attempting to cross at the crosswalk. The evidence of Melieka Perkins' negligence, and Chen Pei's negligence in failing to watch for cars, did not show as a matter of law that the negligence of either or both together was so surprising, so unexpected or so freakish as to be outside of the range of the natural and probable consequences of the City's negligence so as to interrupt

the chain of events and to become an intervening cause of the injury.

It does not seem necessary to again go into significant detail distinguishing the cases upon which the City relies, *Hedayati*, *Johnson*, and *Marston*, which have already been discussed. In *Hedayati*, 860 S.W.2d 795, and *Johnson*, 817 S.W.2d 611, there were no crosswalks or other traffic controls in place at all, and at least in those cases the pedestrian was or should have been on guard. In *Johnson* the pleading raised the inference that there might be a dangerous condition of property in that it asserted that the City had received complaints concerning the street and that the City was on notice of the danger. 817 S.W.2d at 612. However, the petition in *Johnson* was not as well pleaded, in light of 537.600, as the petition in this case. In any event, the facts alleged in *Johnson* pale in comparison to the solid record evidence in this case, including admissions by the traffic engineer that the intersection was dangerous to students, that a traffic light would have been justified, and that an advance sign, at a minimum, was required by widely accepted standards of traffic engineering.

This case is also easily distinguished from *Marston*, 921 S.W.2d 100 (the drag racing case) and *Dierker* (the concrete chunk case) because those cases involved intentionally wanton activities outside of the normal range of the reasonably anticipated driving activities of ordinary citizens. While Ms. Perkins' failures were not excusable, they are not on the same level as the wanton activities of the miscreants in *Dierker* and *Marston*. One does not have to be a traffic engineer to know that every day drivers become impatient with the stoppage of traffic in their lanes and decide to change lanes to go around the stoppage, even when they are uncertain as to the reason for the stoppage. If they do not see the crosswalk and they have not been alerted to the fact that they are still in a special school zone, they may proceed unaware of the danger to pedestrians. The more signs, signals or flashing lights there are to warn the driver, the more likely the driver is to discern that a pedestrian could be crossing. Ms. Perkins specifically testified in this case that she thought she was out of the special school zone. She testified that if there had been a stoplight at the intersection, she would have noticed it and would have complied with the light. It would be impossible for her to say definitively what it would have taken to get her attention—a flashing light, an advance sign, or other warning—without speculating. But the facts do tend to strongly suggest that any such additional warning would very likely have made a difference. The science of traffic engineering shows that such warnings make a difference every day in real life.

If the intersection in this case had been better warned or controlled, and had the accident still happened, the City would have been able to argue more persuasively that, as a matter of law, there was no dangerous condition. The City also could have argued more persuasively that the conduct of the driver was so surprising, so unexpected, or so wanton as to constitute an intervening cause. We determine in this case, however, that the City was not entitled to judgment as a matter of law.

**Conclusion**

For all the foregoing reasons, we conclude that the City did not establish as a matter of law that the City retained its immunity. We deny the City's Points I, II, and III. We also deny the City's additional point related to certain evidentiary rulings (which are dealt with separately by

order and memorandum pursuant to Rule 84.16(b)). We affirm the judgment.

NEWTON and ULRICH, JJ., concur.